UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL L. GETZEN,

               Plaintiff,               CIVIL ACTION NO. 11-14676

      v.                      DISTRICT JUDGE SEAN F. COX

COMMISSIONER OF           MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

               Defendant.

_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 9 and 10)**

**I.    PROCEDURAL HISTORY**

    ***A.    Proceedings in this Court***

    On October 25, 2011, Plaintiff filed a lawsuit seeking judicial review of the

Commissioner's decision to deny benefits (Dkt. 1).  Pursuant to 28 U.S.C. § 636(b)(1)(B) and

Local Rule 72.1(b)(3), the matter was referred to this Magistrate Judge for a report and

recommendation (Dkt. 3).  Cross-motions for summary judgment are pending (Dkts. 9, 11).

Plaintiff also filed a response brief to Defendant's motion for summary judgment (Dkt. 12).

    ***B.    Administrative Proceedings***

    Plaintiff filed his claim for benefits on November 17, 2009, alleging that he became

unable to work on November 10, 2009 (Tr. 107-116).  The claim was initially denied by the

Commissioner on April 1, 2010 (Tr. 56-65).  Plaintiff subsequently requested a hearing and, on

May 10, 2011, Plaintiff appeared with counsel before Administrative Law Judge ("ALJ")

Thomas L. Walters who considered the case *de novo* (Tr. 28-53). In a decision dated May 16, 2011, the ALJ found that Plaintiff was not disabled (Tr. 6-23). Plaintiff requested a review of this decision on June 3, 2011 (Tr. 5). The ALJ's decision became the final decision of the Commissioner on August 23, 2011 when the Appeals Council denied Plaintiff's request for further review (Tr. 1-4).

In light of the entire record, this Magistrate Judge finds that substantial evidence does not support the Commissioner's determination that Plaintiff is not disabled. Accordingly, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **GRANTED**, that Defendant's motion for summary judgment be **DENIED**, and that the case be **REMANDED** for further proceedings consistent with the findings below.

## II.    STATEMENT OF FACTS

### A.    *ALJ Findings*

Plaintiff was 52-years-old on the date his application was filed (Tr. 17). Plaintiff's relevant work history included work as a green's keeper, fence installer, landscaper, and machine operator (Dkt. 17). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since November 10, 2009 (Tr. 12).

At step two, the ALJ found that Plaintiff had the following "severe" impairments: status post cerebral vascular accident ("CVA")[1], high blood pressure, obesity, and tobacco use (Tr. 12).

At step three, the ALJ found no evidence that Plaintiff had an impairment or combination of impairments that met or medically equaled one of the listings in the regulations (Tr. 14).

---

[1]A stroke.

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional

Capacity ("RFC") to perform:

> light work . . . with the following limitations: he can lift and carry 20
> pounds occasionally and 10 pounds frequently; he can sit 6 hours, and
> stand and/or walk 2 hours, in an 8-hour workday; he cannot climb; he
> can only occasionally bend, twist or turn; he cannot walk beyond a city
> block at one time; he cannot work around moving machinery or
> unprotected heights; he is limited to performing tasks of an unskilled
> variety.

(Tr. 14-15).

At step four, the ALJ found that Plaintiff could not perform any of his previous jobs (Tr.

17).

At step five, the ALJ denied Plaintiff benefits, because the ALJ found that Plaintiff could

perform a significant number of jobs available in the national economy, such as

inspector/examiner/checker (15,000 jobs in regional economy), assembler (15,000 jobs in

regional economy), or light janitorial work (10,000 jobs in regional economy) (Tr. 16-18).

### B.    Administrative Record

#### 1.    Plaintiff's Testimony and Statements

Plaintiff testified at the hearing on May 10, 2011, that he just moved in with his son and

grandmother.  He cannot cook, vacuum, mow the lawn, do the laundry, take out the trash, or

shovel snow, but he can occasionally wash dishes and go grocery shopping (Tr. 45-46). Plaintiff

also testified that he completed the eleventh grade, but had not obtained his GED (Tr. 32).

Plaintiff suffered a stroke in November of 2009 (Tr. 33, 35), and attributes many of his

impairments to the stroke including: blurriness in his left eye, poor vision at night, numbness and

cramping in his right arm and left leg, and trouble with speech and forming thoughts (Tr. 35-45).

Plaintiff is also diabetic (Tr. 42).

Plaintiff testified that the numbness in his right arm and the difficulty forming words occur almost daily (Tr. 37). The numbness in his right hand prohibits him from writing and picking up objects such as a pencil or a coin (Tr. 38-39). According to Plaintiff, he can lift ten pounds with his right hand, but, if it is numb, he is unable to lift anything (Tr. 39). Plaintiff stated that he no longer feels as active as he once was; he takes a one to two hour nap "about every day," and no longer golfs or takes walks (Tr. 39, 43). Because of the numbness and cramping in his legs which "happens at least three or four times a week" and the shortness of breath, Plaintiff has difficulty maneuvering up and down stairs as well as walking for more than half a block (Tr. 39-41). Plaintiff also reported issues with sitting or standing for periods longer than 15-20 minutes (Tr. 44-45). Bending over bothers Plaintiff because he gets "dizzy," but he can crouch or kneel (Tr. 45).

Plaintiff testified that he no longer feels comfortable driving, and he is "afraid [he] might have another stroke" (Tr. 43, 46-47). Plaintiff takes medications for cholesterol, high blood pressure, and diabetes; he has not had any side effects from the medications (Tr. 47-48).

### 2. Medical Evidence

Plaintiff was admitted to Bixby Medical Center on November 10, 2009 after experiencing difficulty speaking and weakness in his right side (Tr. 196). Plaintiff was hospitalized for three days because of "episodes of speech disturbance going on for a couple of months" (Tr. 187-188, 193-197).

During a consultation on November 10, 2009, Steven Sherman, M.D., diagnosed Plaintiff with a left hemisphere stroke (Tr. 187-188). Dr. Sherman found that Plaintiff's spontaneous

-4-

speech was fluent, but he had "occasional word findings problems" as well as reading and writing problems and mild aphasia[2]. *Id*. Dr. Sherman was "concerned that there is much more brain at risk" and suggested Plaintiff undergo a carotid ultrasound to determine the need for further testing and treatment. *Id*.

Plaintiff had a head CT (Computed Tomography scan) on November 10, 2009, which revealed findings consistent with subacute infarcts of the left occipital and frontal lobes as well as chronic lacunar infarcts compatible with a prior MRI administered in September 2009 (Tr. 220-221). In Dr. McKeon's discharge summary, he noted that, "[t]hese seem to be old" and "[t]here was nothing new" (Tr. 196-197). On the same day, carotid/vertebral imaging indicated that Plaintiff's left internal carotid artery was occluded (Tr. 216). On November 11, 2009, Plaintiff underwent a magnetic resonance angiogram ("MRA") which revealed that "[n]o flow signals are evident in the intracranial left internal carotid artery or in the proximal left posterior cerebral artery" (Tr. 226).

Upon Plaintiff's discharge, Dr. McKeon, Plaintiff's treating physician, noted that Plaintiff was stable and exhibited no neurological deficits (Tr. 196-197). Plaintiff was advised that it was critical that he stop smoking, take his medications, and look for warning signs for which he should return to the hospital. *Id*. Dr. McKeon also told Plaintiff that he could return to work on November 22, 2009. *Id*.

On November 12, 2009, Dr. McKeon wrote a note to Plaintiff suggesting that he apply for disability for cerebrovascular disease (Tr. 189). Likewise, in an undated document faxed on

---

[2] Aphasia is a condition that robs you of the ability to communicate, and can affect a person's ability to express and understand language, both verbal and written. Aphasia typically occurs suddenly after a stroke or a head injury. Mayo Clinic, http://www.mayoclinic.com/health/aphasia/DS00685 (last visited July 24, 2012).

December 1, 2009, John Barden, D.O., Plaintiff's family doctor, wrote a letter stating that "[Plaintiff] has experienced at least two CVA's and complete obstruction of his left corroded[sic] artery," leaving Plaintiff "prone to further strokes or myocardial infarctions" (Tr. 287). Dr. Barden also stated that work and stress could contribute to these issues which might result in Plaintiff's death, and Dr. Barden suggested that Plaintiff retire immediately (Tr. 287).

On January 16, 2010, Plaintiff was seen by Edward Follas, P.A., a physician's assistant at Family Medical Center (Tr. 277). Mr. Follas indicated that "[w]ithin a couple days [after being hospitalized in November of 2009] symptoms were resolving and [Plaintiff] seems to have experienced essentially 100 percent return." *Id*. Mr. Follas noted that Plaintiff was still easily confused and experienced some short-term memory problems, but also stated that "[Plaintiff] has become functional." *Id*. Mr. Follas performed a neurologic exam which revealed "[n]o appreciable motor sensory function or muscle strength deficit appreciated in any of the extremities," and Plaintiff's speech appeared normal though he exhibited some hesitancy. *Id*. During the examination, Mr. Follas indicated that Plaintiff could occasionally lift/carry less than 10 pounds, stand and/or walk less than 2 hours in an 8-hour workday, and sit less than 6 hours in an 8-hour workday (Tr. 264). Plaintiff could not use his extremities for repetitive action such as reaching, pushing/pulling, or operating foot/leg controls, but Plaintiff could use his hands/arms for simple grasping and fine manipulating. *Id*.

During Plaintiff's one month follow-up in February 2010, Mr. Follas noted that Plaintiff experienced "mild persistent fatigue but overall feeling well and functional" (Tr. 274). Also, the examination revealed no true CVA tenderness and Plaintiff showed no unilateral deficit in strength or function of his extremities. *Id*. Plaintiff and Mr. Follas discussed long-term

-6-

implications concerning Plaintiff's ability to work, and Mr. Follas advised Plaintiff that it appeared he could work.  *Id*.  Mr. Follas reexamined Plaintiff in March 2010, and noted Plaintiff was doing well overall but that Plaintiff made vague complaints related to his right arm (Tr. 272). Mr. Follas found no right arm deficit and noted that Plaintiff's distal motor sensory function and grip strength were intact.  *Id*.

On March 12, 2010, Richard C. Gause, M.D., evaluated Plaintiff's physical and mental condition for the state disability agency (Tr. 243-245).  Dr. Gause noted that Plaintiff had a twelfth grade education (Tr. 243).  He also noted Plaintiff's prior hospitalization for left hemiparesis[3] which affected Plaintiff's speech significantly for about 24 hours, but thereafter quickly returned to normal.  *Id*.  Dr. Gause mentioned that an MRI of Plaintiff's brain "suggested that he had had multiple mini-strokes prior to his hospitalization."  *Id*.  During the physical examination, Dr. Gause noted Plaintiff's immediate, recent, and remote memory were intact, Plaintiff's insight and judgment were both appropriate, and Plaintiff's breath sounds were clear to auscultation and symmetrical (Tr. 244).  Also, Dr. Gause indicated that Plaintiff's grip strength remained intact: "[Plaintiff] could pick up a coin, button clothing, and open a door;" "[Plaintiff] had no difficulty getting on and off the examination table, no difficulty heel and toe walking, no difficulty squatting and arising, and no difficulty hopping."  *Id*.  Dr. Gause concluded that Plaintiff had a short-lived left hemiparesis and was "dysphasic[4] for perhaps one day" (Tr. 245).

_____

[3] Hemiparesis is most often caused by stroke or cerebral palsy, and results in some degree of trouble moving one side or weakness on one side of a stroke victim's body. People with hemiparesis may have trouble moving their arms and legs, difficulty walking and may also experience a loss of balance. National Stroke Association, http://www.stroke.org/site/PageServer?pagename=hemiparesis (Last visited July 25, 2012).

[4] Dysphasia is a partial or complete impairment of the ability to communicate resulting from brain injury. Medical Dictionary, http://medical-dictionary.thefreedictionary.com/dysphasic (Last visited July 25, 2012).

Dr. Gause further stated, "[t]he weakness and speech resolved essentially completely by the time of discharge and [Plaintiff] has done relatively well, since discharge." *Id*.

On March 29, 2010, Shahida Mohiuddin, M.D., reviewed Plaintiff's medical records for the state agency to assess his functioning (Tr. 246-253). Dr. Mohiuddin reviewed records of Plaintiff's November 2009 hospitalization, the medical source opinions regarding disability due to stroke, Plaintiff's September 2009 MRI, and Dr. Gause's March 2010 examination findings (Tr. 247-248). Dr. Mohiuddin found Plaintiff was able to perform occasional lifting and/or carrying of 20 pounds, frequent lifting and/or carrying of 10 pounds, standing and/or walking with normal breaks for about 6 hours in an 8-hour workday, sitting with normal breaks for about 6 hours in an 8-hour workday, and unlimited pushing and/or pulling including operation of hand and/or foot controls (Tr. 247). Dr. Mohiuddin also found Plaintiff needed occasional postural limitations on climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling and limited Plaintiff to never climbing ladders/ropes/scaffolds. *Id*. Dr. Mohiuddin noted that Plaintiff would be expected to have some functional limitations due to his CVA, but that his functioning had improved within three months of the stroke and "[Plaintiff] would remain able to perform [substantial gainful activity] within the limits of this [residual functional capacity]" (Tr. 251). In addition, Dr. Mohiuddin determined that the medical source opinion from November 2009 which stipulated that Plaintiff ought to apply for disability for cerebrovascular disease was not fully supported by the medical evidence record (Tr. 252).

On July 7, 2010, Mr. Follas reexamined Plaintiff and noted that Plaintiff was stressed and emotionally upset concerning "paper work for getting public assistance" (Tr. 270). Mr. Follas determined that Plaintiff had no functional problems with his extremities, normal verbalization,

clear lungs, and "[n]o true CVA tenderness." *Id*.  However, Mr. Follas also stated, "[t]his examiner does feel [Plaintiff] can support his need for public assistance, will fill out the form as soon as possible and will see if he is accomodated." *Id*.

In December 2010, Plaintiff returned to Family Medical Center for a follow-up appointment during which he denied current cerebral palsy or stroke-like symptoms (Tr. 266). The examiner, a registered nurse-certified nurse practitioner, noted that Plaintiff had no calf induration or ankle edema[5], and told him "[her] job was to help keep [Plaintiff] well and that [she] did not necessarily agree with 'disabled' label." *Id*.  Plaintiff told the nurse that "this is the opposite of what he has been told since his CVA (stroke)." *Id*.

Plaintiff was then seen in March 2011 by Cornelio Naguit, M.D., who noted that Plaintiff's primary complaint was occasional blurriness in his left eye (Tr. 293).  Dr. Naguit also noted that, other than Plaintiff's vision complaint, "he does not have any lateralizing symptoms, chest pain or shortness of breath" *Id*; his extremities were negative for peripheral edema and his neurological exam was intact for motor function and coordination.  *Id*.

### 3.    Vocational Expert

At the hearing, the ALJ asked the vocational expert ("VE") a hypothetical question regarding jobs that could be performed by a person who was capable of light, unskilled work with additional restrictions, including: no climbing; only occasional bending, twisting, and turning; no prolonged walking beyond one city block; and, no working around moving machinery or unprotected heights (Tr. 49-50).

---

[5] Edema is swelling caused by excess fluid trapped in your body's tissues. Although edema can affect any part of your body, it is most commonly noticed in the hands, arms, feet, ankles, and legs. Mayo Clinic, http://www.mayoclinic.com/health/edema/DS01035 (Last visited July 25, 2012).

The VE testified that such a person could work as an inspector, a checker, and an examiner, with 15,000 of those jobs at the light, unskilled level (Tr. 50). The VE also testified that such a person could work as an assembler (15,000 jobs) or perform light janitorial work (10,000 jobs), with a total of 40,000 positions available in the regional economy. *Id*.

### C.   *Plaintiff's Claims of Error*

Plaintiff raises three arguments on appeal: (1) the ALJ applied an incorrect disability standard (Dkt. 9, pages 7-8); (2) the ALJ's assessment of Plaintiff's RFC is unsupported by substantial evidence, in particular because it failed to properly consider the risk to Plaintiff in returning to work, despite various medical sources indicating that the risk is significant (Dkt. 9, pages 9-11); and (3) the ALJ's hypothetical to the VE did not contain all the limitations he ultimately included in his RFC assessment, and the VE's failure to provide Dictionary of Occupational Title ("DOT") codes with his job descriptions makes it impossible to determine whether Plaintiff could still perform those jobs (Dkt. 9, pages 11-13).

## III.   DISCUSSION

### A.   *Standard of Review*

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious. *See Sullivan v. Zebley*, 493 U.S. 521 (1990).  The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *See Bowen v. Yuckert*, 482 U.S. 137 (1987).  If relief is not found during this administrative review process, the claimant may file an action in federal district court.

*Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).  In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may. . . consider the credibility of a claimant when making a determination of disability"); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor and credibility") (internal quotation marks omitted); *Walters*, 127 F.3d at 531 ("[d]iscounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence").  "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'"  *Rogers*, 486 F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

-11-

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g).  Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475.  "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citing *Mullen*, 800 F.2d at 545).

The scope of this Court's review is limited to an examination of the record only.  *See Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight.  *See Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council."  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed.Appx.

-12-

521, 526 (6th Cir. 2006).

### B.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. Appx. 515, 524 (6th Cir. 2003).  There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq*.) and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq*.). Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'"  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments, that "significantly limits...physical or mental ability to do basic work activities," benefits are denied

-13-

without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534.  "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates."  *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by his impairments and the fact that he is precluded from performing his past relevant work."  *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540.  If the analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the Commissioner.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors."  *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

C.   ***Analysis and Conclusions***

1.     **The ALJ Applied the Correct Disability Standard**

-14-

As noted above, Plaintiff raises three arguments on appeal (Dkt. 9, pages 7-13).  The first argument is whether the ALJ required a higher standard of proof than necessary in determining that Plaintiff was not disabled (Dkt. 9, pages 7-8). Specifically, Plaintiff argues that "the ALJ's search for 'work preclusive limitations' or evidence of 'totally debilitating pathology' demonstrates the application of an unduly strict standard of proof, requiring reversal" (Dkt. 9, page 8).

The ALJ stated:

After careful consideration of the evidence, the undersigned finds that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

Specifically, no physician imposed a work preclusive limitation on [Plaintiff's] functioning.  The undersigned notes the results of MRI, MRA, CT, EKG, echocrdiographic and clinical evaluations, which do not unveil totally debilitating pathology.  Fortunately, [Plaintiff] has not suffered stroke recurrence, or significant residuals from his cerebral accident. [Plaintiff] has some history of elevated blood pressure that is reasonably managed. [Plaintiff] does not manifest hypertensive retinopathy, carotid bruits, jugular venous distention or other end stage damage.  Echocardiographic analysis disclosed normal cardiac function and anatomy, and no ischemia or valvular vegetation.

(Tr. 15-16).

Plaintiff's argument misconstrues the ALJ's comments.  The ALJ used the phrases "work preclusive limitations" and "totally debilitating pathology" when he was assessing the credibility of Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms.  These phrases were used to point to inconsistencies between Plaintiff's statements and the medical record, not to determine whether Plaintiff was disabled.

-15-

### 2.     The ALJ's Assessment of Plaintiff's RFC is Supported By Substantial Evidence

Plaintiff next argues that the ALJ's assessment of Plaintiff's RFC was incomplete, because it did not account for the substantial risk Plaintiff faced if he returned to work. Specifically, Plaintiff argues that "[b]y disregarding the substantial risk plaintiff would face in performing the very work found suitable for him, the ALJ failed to render a complete RFC analysis" (Dkt. 12, page 3).

### a.     Dr. Barden's Letter

A letter from Dr. Barden says, "[Plaintiff] has experienced at least two CVA's (stroke) and complete obstruction of his left corroded[sic] artery.  This leaves him prone to further strokes or myocardial infarctions.  Work and stress could contribute to this happening[] with his resulting death.  I feel he should retire immediately" (Tr. 287).  Plaintiff says Dr. Barden's letter lists an objective anomaly, and the ALJ was incorrect when he rejected Dr. Barden's opinion because "he cited no objective anomalies of any sort."

This Magistrate Judge finds the ALJ did not err in assessing Dr. Barden's letter.  First, the ALJ did not outright reject Dr. Barden's opinion; he gave it some weight.  Second, SSR 96-5p says "opinions form any medical source on issues reserved to the Commissioner must never be ignored."  The ALJ did not *ignore* Dr. Barden's letter, he simply did not give it controlling weight.  Finally, the ALJ's reasons for not giving Dr. Barden's letter controlling weight included more than the fact that he believed Dr. Barden's letter did not cite any objective anomaly.  *See* Tr. 16:

> The undersigned considered the comments from J. Barden, D.O.  On November 12, 2009, immediately after [Plaintiff] incurred his stroke, Barden wrote on a

prescription slip that [Plaintiff] should file for disability (Exhibit 2F).  In an undated letter Barden remarked that [Plaintiff] was prone to further stokes[sic]; that work and stress could contribute to this happening with resulting death; and that he should retire immediately (Exhibit 13F).  It is conceivable that certain types of work could place some risk on [Plaintiff's] health.  So too, could [Plaintiff's] smoking addiction and dietary habits.  *Dr. Barden listed no specific vocationally relevant limitations for [Plaintiff], and he cited no objective anomalies of any sort.  Barden's conclusionary[sic] statements are not well supported, persuasive or due meaningful weight*.

(Emphasis added).

In addition, the medical record offers substantial evidence in support of a finding of not disabled.  Although an MRA revealed Plaintiff to have a completely occluded left internal carotid artery, Dr. McKeon nevertheless found Plaintiff to be stable with no neurological deficits and informed Plaintiff that he could return to work just nine days after discharge (Tr. 196-197).  During an examination for the DDS, Dr. Gause diagnosed Plaintiff with "short-lived left hemiparesis," but found that Plaintiff's "weakness and speech resolved essentially completely by the time of discharge and [Plaintiff] has done relatively well, since discharge" (Tr. 245).  Further, during a physical RFC assessment, Dr. Mohiuddin determined Plaintiff "would be expected to have some functional limitations due to his [stroke]," but ultimately found that Plaintiff's functioning improved and "he would remain able to perform [substantial gainful activity] within the limits of this RFC" (Tr. 251).  The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *see also Kidd v. Comm'r of Soc. Sec.*, 283 Fed.Appx. 336, 340 (6th Cir. 2008).

### b.     Clinicians Follas and Naguit

In July 2010, two clinicians from the Family Medical Center, Follas and Naguit, opined

that Plaintiff was at risk of further injury.  *See* Tr. 263 ("Pt. is at risk (excessive) of further

vascular injury (e.g. brain or heart) *[with] substantial physical exertion*") (emphasis added).  The

ALJ mentioned the July 2010 document:

> Family Medical Center clinicians Follas and Naguit, co-signed a July 2010
> document (Exhibit 9F) on which were listed restrictions for [Plaintiff]
> incompatible with an ability to perform full time competitive employment (e.g.,
> could sit, stand and walk for a total of less than 8-hours in a workday) (prior to
> this, Follas had advised [Plaintiff] he believed he was capable of working; See
> Exhibit 10F p.10).  The level of dysfunction suggested in the July 2010 appraisal
> is not justified, and is contraindicated by substantial evidence in the record.  The
> clinical narratives of the Family Medical Center summarized above, consistently
> showed benign findings, preserved neurological status and overall good
> functionality for [Plaintiff].  In light of these circumstances, little weight can be
> accorded the July 2010 assessment o[f] Follas and Naguit.

(Tr. 17).  However, Plaintiff argues the ALJ's assessment was incorrect, because the clinicians'

opinion was based on the danger to Plaintiff if he engaged in significant exertion, not on purely

functional limitations.

This Magistrate Judge agrees with Plaintiff that the ALJ's assessment of Follas and

Naguit's July 2010 document only included functional limitations, and did not include an

assessment of their note that Plaintiff was at risk of further vascular injury.  Nonetheless, Follas

and Naguits' document specifically stated that Plaintiff was at risk of further injury *with*

*substantial physical exertion*.  And, the ALJ limited Plaintiff to

> light work . . . with the following: he can lift and carry 20 pounds occasionally
> and 10 pounds frequently; he can sit 6 hours, and stand and/or walk 2 hours, in an
> 8-hour workday; he cannot climb; he can only occasionally bend, twist or turn; he
> cannot walk beyond a city block at one time; he cannot work around moving
> machinery or unprotected heights; he is limited to performing tasks of an
> unskilled variety.

(Tr. 14-15).  This Magistrate Judge finds that while the ALJ did not specifically analyze the

-18-

clinicians' note that Plaintiff was at risk of further injury, he implicitly took the note into consideration in his RFC determination by prohibiting Plaintiff from "substantial physical exertion."

> c.      Dr. Sherman and Dr. McKeon

Plaintiff points to Dr. Sherman's statement that he was "concerned that there is much more brain at risk" (Tr. 188), and Dr. McKeon's recommendation that Plaintiff apply for disability (Tr. 189).  While the ALJ did not mention this statement or recommendation, there is no requirement that the ALJ discuss every piece of evidence in the administrative record.  *See Kornecky*, 167 Fed. Appx. at 508.  Further, this statement and recommendation does not mean Plaintiff was "disabled" as defined by statute.

> 3.      The ALJ's Finding that a Significant Number of Jobs Accommodated Plaintiff's RFC and Vocational Profile is not Supported By Substantial Evidence

Plaintiff's final argument is that the ALJ's hypothetical to the VE did not contain all the limitations the ALJ included in his RFC assessment, and the VE's failure to provide DOT codes with his job descriptions made it impossible to determine whether Plaintiff could perform those jobs.

The ALJ found Plaintiff had the RFC to perform light work with the following limitations:

> he can lift and carry 20 pounds occasionally and 10 pounds frequently; he can sit 6 hours, and *stand and/or walk 2 hours, in an 8-hour workday*; he cannot climb; he can only occasionally bend, twist or turn; *he cannot walk beyond a city block at one time*; he cannot work around moving machinery or unprotected heights; he is limited to performing tasks of an unskilled variety.

(Tr. 14-15) (emphasis added).  The ALJ presented the following hypothetical to the VE:

-19-

> I am going to ask you to assume a person of the same age, education, vocational experience as [Plaintiff] who would have a residual functional capacity for range of light and unskilled work. That range would be further restricted by the need for no climbing, only occasional bending, twisting and turning, no prolonged walking beyond one city block, and also no working around moving machinery or unprotected heights.

(Tr. 49). Plaintiff says the hypothetical to the VE did not accurately depict Plaintiff's limitations; it mentions that Plaintiff cannot walk beyond a city block, but does not mention that he can only stand and/or walk for 2 hours in an 8-hour workday. (Dkt. 9, pages 3-4). According to Plaintiff:

> [t]he prohibition against walking beyond a city block deals with limitations as to a single episode of walking, but does not address the frequency such an episode would be permitted or, more particularly, how many such episodes plaintiff would be capable of. By contrast, an overarching limit of two hours per eight-hour day takes into account the *cumulative* amount of walking throughout the day. There[sic] are *not* equivalents, and should not be treated as such.

(Dkt. 12, page 4) (emphasis in original).

When the ALJ determined Plaintiff's RFC, he included *both* the limitation that Plaintiff can only stand and/or walk 2 hours in an 8-hour workday and the limitation that Plaintiff cannot walk beyond a city block. Accordingly, it seems as though the ALJ himself did not believe these limitations were equivalent. This Magistrate Judge agrees with Plaintiff, and finds the VE's testimony does not constitute substantial evidence to support a finding that Plaintiff is capable of performing a significant number of jobs in the national or regional economy. *See Webb v. Commissioner*, 368 F.3d 629, 633 (6th Cir. 2004) (where the hypothetical does not accurately depict Plaintiff's limitations, the VE's testimony cannot support such a finding). It is certainly conceivable that the VE assumed that an individual capable of *walking* a block could *stand* for more than two hours, because the VE was not given Plaintiff's 2-hour standing limitation.

However, on remand, the VE need not supply the DOT occupational codes. SSR 00-4p

only requires the ALJ to ask the VE whether his testimony conflicts with the DOT.  If there is no

conflict, the ALJ need not inquire further.  *See Lindsley v. Comm. of Soc. Sec.*, 560 F.3d 601,

605-606 (6th Cir. 2009).

## IV.    RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for summary

judgment be **GRANTED**, that Defendant's motion for summary judgment be **DENIED**, and that

the findings and conclusions of the Commissioner be **REMANDED** for further proceedings.

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as

provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific

objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140

(1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v.

Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues,

but fail to raise others with specificity, will not preserve all the objections a party might have to

this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401

(6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.

1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this

Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the

opposing party may file a response. The response shall be no more than 20 pages in length

-21-

unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon
MARK A. RANDON
UNITED STATES MAGISTRATE JUDGE


Dated: August 22, 2012

*Certificate of Service*

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, August 22, 2012 by electronic and/or ordinary mail.*

*s/Melody Miles*
*Case Manager to Magistrate Judge Mark A. Randon*
(313) 234-5540